UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/2/15

------------------------------------------------------X

MARVIN PINES, JR.,                              :

               Plaintiff,          :

     -against-                          :

COMMISSIONER OF SOCIAL SECURITY,   :

             Defendant.          :

--------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
ALISON J. NATHAN**

13cv6850-AJN-FM

**FRANK MAAS**, United States Magistrate Judge.

       Plaintiff Marvin Pines, Jr. ("Pines") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), seeking

review of a final decision of the Commissioner of Social Security ("Commissioner")

denying his application for Supplemental Security Income benefits ("SSI").[1]  The parties

have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons set forth below, Pines' motion should

be granted in part, the Commissioner's cross-motion should be denied, and this case

should be remanded pursuant to sentence four of Section 205(g) of the Act for further

proceedings consistent with this Report and Recommendation.

---

[1]     SSI differs from Social Security Disability in that the claimant must show
financial need, but need not previously have been insured for benefits.  The standards for
determining disability under both programs are the same.  See Barnhart v. Thomas, 540 U.S. 20,
24 (2003).

I.      Background

A detailed recitation of the non-medical and medical evidence may be found in the parties' motion papers.  (See ECF No. 11 ("Pl.'s Mem); ECF No. 21 ("Def.'s Mem.")).  In brief, that evidence indicates that Pines was born in 1957, making him fifty-four years old at the time of the hearing, and has a GED.  (R. 48, 105, 120, 125).[2]  He was diagnosed with HIV in 2002 and with hypertension in 2005.  (Id. at 261).  Pines began using cocaine and heroin at age twenty-five and continued to do so until in or around 2010.  (Id. at 41-42, 262, 328).  At age nineteen, Pines was imprisoned for robbery, and he has since been arrested some fifty times.  (Id. at 46, 267).  In or around December 2007, while he was incarcerated, Pines had an accident that resulted in a fractured left thumb and nerve damage, which has limited the use of his left non-dominant hand.  (Id. at 42, 134-36, 145, 148-49).

Pines claims that he is unable to work because he hears voices, suffers from anxiety, bipolar disorder, and post-traumatic stress disorder ("PTSD"), is HIV positive, and has a metacarpal fracture of his left hand with nerve damage.  (Id. at 39-40, 124, 162, 179).

---

[2]      "R" refers to the certified copy of the administrative record filed together with the Commissioner's answer.  (ECF No. 7).  The Commissioner's memorandum of law refers to documents submitted to the Appeals Council after the ALJ's decision which were not part of the administrative record originally filed.  (See Def.'s Mem. at 10, 17).  The United States Attorney's Office supplied those additional pages to the Court by letter dated February 26, 2015.  (See ECF No. 25).  Because the additional records relate to a period after the ALJ's decision, (see id.), I have not considered them.

On February 2, 2011, Pines filed an application for SSI, alleging that he became disabled on January 24, 2011.  (Id. at 105-113).  After his application was denied initially, Pines requested a hearing before an Administrative Law Judge ("ALJ").[3]  (See id. at 11, 54-57, 58-59).  On February 7, 2012, Pines and his attorney appeared before ALJ Curtis Axelsen for that hearing.  (Id. at 35-51).  On March 21, 2012, the ALJ found that Pines was not disabled.  (Id. at 8-19).  The ALJ's decision became the final decision of the Commissioner on August 15, 2013, when the Appeals Council denied Pines' request for review.  (Id. at 1-7, 33).  Pines then timely commenced this action on September 26, 2013.  (ECF No. 1).

II.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such

---

[3]    Pines' request for a hearing is not included in the administrative record.

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison

Co. v. NLRB, 305 U.S. 197, 229 (1938)).

  A district court is not permitted to review the Commissioner's decision de

novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134

F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather,

the court's inquiry is limited to ensuring that the Commissioner applied the correct legal

standard and that his decision is supported by substantial evidence. See Hickson v.

Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22,

2011). When the Commissioner's determination is supported by substantial evidence, the

decision must be upheld, "even if there also is substantial evidence for the plaintiff's

position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

III. Disability Determination

  The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). "[W]hether a claimant is disabled and cannot work" is a matter "reserved

for the Commissioner." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20

C.F.R. § 404.1527(e)(1)). In determining whether a claimant is disabled, the

Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R.

§§ 404.1520 and 416.920.

> The Second Circuit has described this familiar process as follows:
>
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps. DeChirico v.

Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the claimant sustains their burden at

each of these steps, then the burden shifts to the Commissioner at step five. Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered

include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or

other[s]; and (4) the claimant's educational background, age, and work experience."

Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).  When reviewing the medical

evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312

F.3d at 588; see also Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts

within the evidence, their resolution is a matter committed to the Commissioner's

discretion.  See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing

Veino, 312 F.3d at 588).

IV.    Relevant Facts

     A.    Dr. Izrayelit's Findings

       The City Human Resources Administration referred Pines to Dr. Leonid

Izrayelit, at First Steps to Recovery ("Steps"), because of his "continuing use of opioids

and cocaine."  (R. 328).  Pines then apparently met with Dr. Izrayelit for the first time in

January 2011.[4]  At the time of the first visit, Dr. Izrayelit noted Pines' history of drug use,

recent withdrawal symptoms, and methadone treatment.  (Id. at 328-29, 331).  Pines

reported a history of hypertension and a hand fracture, but denied any operations,

hospitalizations, or prior psychiatric history.  (Id. at 328-29).  A physical review of Pines'

systems was generally unremarkable, but Pines presented as sad, depressed and anxious.

---

[4]    A document which appears to be Dr. Izrayelit's initial Psychiatric Assessment
was dated October 28, 2010, but that date was crossed out and replaced with the date January 19,
2011.  (R. 331).  In addition, Dr. Izrayelit apparently initialed the change, noting that it was an
"error."  (Id.).  A Medical Assessment form, also dated January 19, 2011, (id. at 328), further
suggests that the January date is the correct one.  (See also id. at 188 (letter from counsel
acknowledging January 19, 2011 as the date "Pines began treatment" with Dr. Izrayelit), 348
(reference to the  "beginning of treatment" in "January")).

(Id. at 329-30).  A corresponding Psychiatric Assessment form noted that Pines claimed

to have PTSD as a result of "severe fights while in jail," during which Pines "reportedly

had to 'defend his life.'"  (Id. at 331).  Pines' mood was described as

"tense/labile/dysphoric," but he denied any hallucinations, delusions, or suicidal or

homicidal ideation.  (Id. at 333).  Pines' behavior and thought process were organized, he

exhibited average intelligence, fair judgment and impulse control, and a fair attitude

toward his illness.  (Id.).  Dr. Izrayelit's diagnoses, insofar as relevant, were opioid

dependence, PTSD, rule out bipolar disorder NOS, and rule out antisocial personality

disorder.  (Id.).  Dr. Izrayelit also assigned Pines a GAF score of 65/70, reflecting mild

symptoms.[5]  (Id.).  Dr. Izrayelit prescribed Zoloft and recommended psychotherapy.  (Id.

at 334).

During his next visit to Steps on February 16, 2011, Pines reported

"minimal improvement while taking Zoloft."  (Id. at 335).  Dr. Izrayelit increased Pines'

---

[5]       The GAF scale is a numeric scale ranging from 0 to 100 that clinicians formerly used to rate their patient's social, occupational, and psychological functioning.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) ("DSM-IV-TR").  The scale was introduced in the revised version of the DSM's third edition, id. at 12 (3d ed., rev. 1987), but has been removed from the most recent edition, which was released in 2013, id. at 16 (5th ed. 2013) ("DSM-5").

"Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning."  DSM-IV-TR at 32.  A GAF in the 61 to 70 range reflects a person who has "[s]ome mild symptoms" such as "depressed mood and mild insomnia," or "some difficulty in social, occupational, or school functioning . . . , but [who is] generally functioning pretty well, [and having] some meaningful interpersonal relationships." DSM-IV-TR at 34.  Although the use of the GAF scale has been discontinued, it remained in effect throughout the time of Pines' treatment.  As the Commissioner impliedly concedes, Pines' GAF score therefore is appropriately considered here.  (See Def.'s Mem. at 20).

Zoloft dosage and prescribed Trazadone.  (Id.).  After missing his next appointment on March 16, Pines reported on March 30 that he had run out of medication; he also requested different medication because he feared possible side effects from Zoloft.  (Id.).  Dr. Izrayelit discontinued Zoloft and prescribed Lexapro in addition to Trazadone.  (Id.).  On May 11, Pines denied any side effects from the medications, but reported that he felt "depressed and irritable."  (Id. at 336).  Pines also "demand[ed] a letter excusing him" from the rest of the Steps program.  (Id.).  Dr. Izrayelit found Pines to be "manipulative and dramatic;" he also reported Pines' affect as "labile" and his mood as "sad."  (Id.).

On June 22, 2011, Pines reported "sadness and insomnia," but admitted that "his mood, anxiety level and sleep had somewhat improved" since taking Seroquel, and denied any side effects.  (Id.).  On August 8, Pines reported "nightmares and flashbacks of traumatic events that happened when he was incarcerated," as well as "very 'vivid' memories," and stated that he feared getting into a fight "when he is around people."  (Id. at 337).  Dr. Izrayelit found that Pines' thought process was goal directed, with no evidence of auditory or visual hallucinations or suicidal or homicidal ideation, but that Pines' affect was "fearful [and] tense."  (Id.).  In a note to the Human Resources Administration that same day, Dr. Izrayelit noted that Pines has been receiving psychotherapy and follow-up psychiatry treatment since January 11, 2011, for opioid dependence, PTSD, and bipolar disorder NOS, and he opined that "[d]ue to severe functional impairment secondary to severe chronic psychiatric illness, Mr. Pines is unable to function in a work-like surrounding."  (Id. at 192) (emphasis in original).

On September 7, 2011, Pines reported to Dr. Izrayelit that he had applied for disability benefits and was awaiting a hearing.  (Id. at 337).  Pines "continue[d] to describe flashbacks of his past traumatic experiences" and some "voices from the past." (Id. at 338).  Pines showed "no symptoms of psychosis," however, and no suicidal or homicidal ideation or delusions.  (Id.).  On September 21, Pines visited Steps to request that Dr. Izrayelit fill out papers for his counsel related to his disability claim.  (Id.). Pines' behavior was organized, he exhibited no harmful ideation, and he reported no side effects from his medication.  (Id.).  Dr. Izrayelit prepared a note to Pines' counsel in which he summarized Pines' treatment for opioid dependence in remission and PTSD, stating that Pines' claim of "long-term abstinence . . . is consistent with his 'clean' urine tox. screens."  (Id. at 193).  Dr. Izrayelit also noted that Pines "continuously complain[ed] of flashbacks and nightmares, anxiety and social avoidance" stemming from his experiences while incarcerated.  (Id.).

That same day, Dr. Izrayelit also completed a Psychiatric/Psychological Impairment Questionnaire for Pines' counsel.  (Id. at 341-48).  He diagnosed Pines as suffering from opioid dependence (in remission), PTSD, antisocial personality disorder, and hypertension, and assigned Pines a GAF of 65.  (Id. at 341).  He described Pines' prognosis as "guarded/fair" and noted that Pines' emotional state would improve if he remained "off" illegal drugs.  (Id.).  By checking boxes on the form, Dr. Izrayelit indicated that the clinical findings supporting his diagnoses included Pines' sleep and mood disturbance, personality change, emotional lability, recurrent panic attacks,

anhedonia (pervasive loss of interests), difficulty thinking and concentrating, paranoia or suspiciousness, generalized anxiety and social withdrawal, as well as "flashbacks of [the] emotional and physical trauma [that] he suffered while incarcerated." (Id. at 342). Pines' most frequent and severe symptoms were the flashbacks and insomnia. (Id. at 343). Dr. Izrayelit noted that Pines has never required hospitalization or emergency room treatment for any of his symptoms. (Id.).

Dr. Izrayelit also assessed the effects of Pines' symptoms and conditions by checking boxes on the form. In the area of Pines' ability to function, Dr. Izrayelit noted no limitation with respect to Pines' understanding and memory, including his ability to "remember locations and work-like procedures," and "understand and remember one or two step" instructions and "detailed instructions." (Id. at 344). In the area of sustained concentration and persistence, Pines was not limited in his ability to "carry out simple one or two-step instructions" and "make simple work related decisions," was mildly limited in his ability to "carry out detailed instructions," moderately limited in his ability to "maintain attention and concentration for extended periods," "work in coordination with others," and "complete a normal workweek [and] . . . perform at a consistent pace," and markedly limited in his ability to perform within a schedule, maintain regular attendance, be punctual, and sustain an ordinary routine without supervision. (Id. at 344-45). In the area of social interaction, Pines was not limited in his ability to "ask simple questions or request assistance," but was moderately limited in his ability to "interact appropriately with the general public" and "maintain socially appropriate behavior," and markedly

limited in his ability to "accept instruction and respond appropriately to criticism" and "get along with co-workers or peers without distracting them or exhibiting behavioral extremes." (Id. at 345). In the area of adaptation, Pines was not limited in his ability to "be aware of normal hazards and take appropriate precautions," and only mildly limited in his ability to "respond appropriately to changes in the work setting," "travel to unfamiliar places or use public transportation," and "set realistic goals or make plans independently." (Id. at 345-46). Dr. Izrayelit noted that Pines was not a malingerer, and that his impairments were ongoing and likely to produce good days and bad days. (Id. at 347). Dr. Izrayelit indicated that Pines was likely to be absent from work more than three times per month. (Id. at 348). Pines did not demonstrate reduced intellectual functioning, however, and Dr. Izrayelit found Pines to be "capable of low stress" work. (Id. at 347).

During a visit on November 2, 2011, Dr. Izrayelit recorded that Pines "continue[d] to appear to be somewhat dramatic and manipulative, . . . but at the same time, somewhat anxious and tense." (Id. at 339). Pines further appeared "fearful," socially avoidant, and "scared of people," and sometimes experienced auditory hallucinations, but he denied "any suicidal or homicidal ideas . . . or plans." (Id.). Dr. Izrayelit instructed Pines to call 911 or visit an emergency room if he "experience[d] command hallucinations or fe[lt] out of control," and he increased Pines' Seroquel dosage and continued his Lexapro. (Id.). That same day, in a note to Pines' counsel, Dr. Izrayelit stated that Pines "continues to experience severe symptoms of PTSD, emotional

instability, fears, nightmares, social avoidance and panic attacks in social situations," explaining that "[Pines'] functioning is severely impaired." (Id. at 194).

On December 14, 2011, Dr, Izrayelit noted that Pines had run out of his medications five days earlier.  Although the treatment note reproduced in the record is incomplete, Dr. Izrayelit apparently indicated that Pines still had episodes of auditory hallucinations, particularly when not taking his medications.  (Id. at 362).  Pines' affect was labile, his mood was sad, and he was somewhat irritable.  (Id. at 363).  Dr. Izrayelit adjusted his medication dosages.  (Id.).

Finally, on February 1, 2012, by checking boxes on a form letter, Dr. Izrayelit noted that Pines was "totally disabled without consideration of any past or present drug . . . use," that Pines was not currently using drugs, and that his prior use of drugs was a symptom of his PTSD, which was itself disabling independent of any drug use.  (Id. at 349).

B.      Dr. Fujiwaki's Consultative Findings

On April 12, 2011, Dr. Haruyo Fujiwaki, a psychologist, conducted a consultative psychiatric evaluation.  Dr. Fujiwaki evidently did not review Dr. Izrayelit's treatment records before that session since he stated:  "No outpatient treatment history reported.  No current treatment reported." (Id. at 266).

In recounting his history to Dr. Fujiwaki, Pines indicated that he had experienced depression since being diagnosed as HIV positive in 2002.  (Id.).  Pines reported depressive symptoms including trouble sleeping, nightmares, feelings of

hopelessness, feeling sorry for himself, crying spells, and loss of energy.  (Id. at 266-67).

He further reported experiencing anxiety, including "nervous[ness] around people" and

the police, and that he suffered from  "palpitations, sweating, and dizziness," but he

denied any "manic [or] psychotic symptoms."  (Id. at 267).  Pines reported that he was

treating his drug dependency with methadone and was attending outpatient drug treatment

at Steps four times per week.  (Id.).

Upon examination, Pines was cooperative and responsive.  His social skills,

manner of relating, grooming, speech, language skills, and overall presentation were

adequate, although his eye contact was poor.  (Id.).  Pines' mood was dysthemic,[6] but he

showed "no evidence of hallucinations, delusions, or paranoia."  (Id.).  Pines was

adequately oriented, his sensorium was clear, his attention and concentration were intact,

and he could "count and do simple calculations," as well as "serial 3s."  (Id. at 268).

Pines' memory skills were mildly impaired.  (Id.).  His intellectual functioning was

"below average," his "[g]eneral fund of information was somewhat limited," and his

insight and judgment were "fair to poor."  (Id.).  With respect to activities of daily living,

Pines reported being able to "dress, bathe and groom himself," and that he could cook,

clean, do laundry and go shopping, manage his money, and use public transportation.

(Id.).  He socialized with friends and went to the park twice per week.  (Id.).  Dr.

_____

[6]        Dysthymia is a "chronic mood disorder manifested as depression for most of the
day" generally accompanied by symptoms including "poor appetite or overeating, insomnia or
hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making
decisions, and feelings of hopelessness."  Stedmans Medical Dictionary (27th ed. 2000).

Fujiwaki's diagnoses were depressive disorder NOS, anxiety disorder NOS, and cocaine and opioid dependence, in remission; he also diagnosed Pines as having a personality disorder NOS, with antisocial features. (Id. at 269). He described Pines' prognosis as "[g]uarded" and recommended that Pines "[r]eceive psychological and psychiatric treatment." (Id.).

With respect to vocational abilities, Dr. Fujiwaki determined that Pines could "follow and understand simple directions and instructions[,] . . . perform simple tasks independently[,] . . . maintain attention and concentration to a certain extent[,] . . . maintain a regular schedule[, and] . . . make some simple decisions." (Id. at 268). Pines, however, would require "extended time" to "learn new tasks," have difficulty "perform[ing] complex tasks," "need[] supervision," and might "have some difficulty relating with others and dealing with stress appropriately." (Id.). Dr. Fujiwaki ventured no opinion as to whether Pines would miss any work by virtue of his impairments. (See id.).

V.      ALJ's Decision

In his decision, the ALJ determined at Step One of the mandated sequential analysis that Pines had not engaged in substantial gainful activity since applying for SSI on January 24, 2011. (Id. at 13). At Step Two, the ALJ found that Pines' left thumb injury, HIV, and PTSD each were severe impairments. (Id.). At Step Three, the ALJ concluded that these impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (Id. at 13-

14).  At Step Four, the ALJ found that Pines had the residual functional capacity ("RFC")
to perform light work subject to certain restrictions.  (Id. at 14-17).  Finally, at Step Five,
the ALJ concluded that Pines had the RFC to perform jobs that existed in significant
numbers in the national economy.  (Id. at 17-18).  The ALJ reached this determination
based upon his review of the Medical-Vocational Guidelines (commonly known as the
"Grids") and the testimony of a vocational expert.  (Id.).  This, in turn, dictated a finding
that Pines was not disabled within the meaning of the Act.  (See id. at 18).

VI.     Discussion

        The question presented by the cross-motions is whether the ALJ's decision
that Pines was not disabled between January 24, 2011 (his alleged onset date), and March
24, 2012 (the date of the ALJ's decision), is legally correct and supported by substantial
evidence.  In his papers, Pines contends that the ALJ erred by:  (a) failing to follow the
"treating physician" rule; (b) assessing Pines' credibility improperly; and (c) relying on
flawed vocational expert testimony and an incorrect application of the Grids.  (Pl.'s Mem.
at 7-15).  As set forth below, the first two of these claims implicate the ALJ's duty to
develop the record.  Accordingly, because the ALJ neither developed the record
adequately, nor gave good reasons for failing to accept certain of Dr. Izrayelit's opinions,
the case should be remanded.

A.     <u>Applicable Law</u>

1.     <u>Duty to Develop the Record</u>

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act."  <u>Moran v. Astrue</u>, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted).  An ALJ's failure to develop the record adequately is consequently an independent ground for vacating the ALJ's decision and remanding the case.  <u>Id.</u> at 114-15.

When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.  <u>Schaal</u>, 134 F.3d at 505; <u>Hilsdorf v. Comm'r of Soc. Sec.</u>, 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. §§ 404.1512(e), (e)(1)).[7]  In such instances, the ALJ may request from the medical source copies of the claimant's medical records, a new report, or a more detailed report.  <u>Jimenez v. Colvin</u>, No. 11 Civ. 4599 (DRH), 2013 WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013).  Here, at the time the hearing was held, the ALJ's duty was not limited to circumstances in which there was a gap in the record, but also extended to those in which "the report from [a claimant's] medical source

---

[7]     20 C.F.R. § 404.1512(e) is currently codified at 20 C.F.R. § 404.1512(d).

contain[ed] a conflict or ambiguity that must be resolved."  20 C.F.R. § 404.1512(e)(1) (2010).[8]

### 2.  Treating Physician Rule

The "treating physician rule" requires an ALJ "to grant controlling weight to the opinion of the claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence."  Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  As the Second Circuit has explained, a treating physician's opinion typically is accorded special consideration because of the "continuity of treatment he provides and the doctor/patient relationship he develops" with the claimant, which "place[s] him in a unique position to make a complete and accurate diagnosis of his patient."  Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

Notwithstanding the deference customarily accorded to treating physicians, the Commissioner need not grant "controlling weight" to their opinions regarding the ultimate issue of disability, as this decision rests exclusively with the Commissioner.  See 20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  As to

---

[8]     This regulation has since been modified, effective March 26, 2012, to delete the quoted language.  See Walker v. Colvin, No. 12-CV-116S, 2013 WL 5487443, at *3 n.4 (W.D.N.Y. Sept. 30, 2013).  In another recent case before me, the Commissioner impliedly conceded that the regulation in effect at the time of the ALJ hearing should govern this Court's determination of the Commissioner's compliance with her duty.  See Reyes v. Colvin, No. 13cv3464-WHP-FM, Report & Rec. at 8 n.7 (S.D.N.Y. Feb. 25, 2015).  I have made that same assumption here.

other issues, in deciding what weight to give to the opinion of a treating physician, the

Commissioner must consider a number of factors, including the length of the treating

relationship and the frequency of examinations, the extent of any supporting evidence,

such as laboratory reports, and the consistency of the opinion with the record as a whole.

See 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-2p, 1996 WL 374188 (July 2, 1996).

       The Commissioner further must provide "good reasons" for the weight, if

any, he gives to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2).  If the ALJ

fails to apply the correct standard in weighing a treating physician's opinion or fails to

give good reasons for rejecting the opinion, a remand for further fact finding is the

appropriate remedy.  Halloran, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734

(RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d

at 506).

     **B.**   <u>Application of Law to Facts</u>

       Pines does not appear to contend that his thumb injury rendered him unable

to work.  Accordingly, the issue before the Court is whether his psychological impairment

rendered him disabled within the meaning of the Act.  In that regard, both Drs. Fujiwaki

and Izrayelit reported many similar findings.  For example, they both diagnosed Pines as

having drug dependence and antisocial personality disorders (R. 269, 341); noted the

presence of many of the same depressive symptoms (id. at 266-67, 342-43); and found

that Pines could remember, understand, and carry out simple directions and instructions

and make simple decisions (id. at 268, 344-45).

Where the two experts parted company was with respect to Pines' ability to appear regularly for work.  Dr. Fujiwaki opined that Pines could maintain a regular work schedule.  (Id. at 268).  By comparison, Dr. Izrayelit reported in September 2011 that Pines had marked limitations in that area.  (Id. at 344).  Dr. Izrayelit also concluded at that time that Pines would miss more than three days of work each month, (id. at 348), an issue that Dr. Fujiwaki simply did not address – except to the extent that he indicated that Pines could maintain a regular schedule.  On February 1, 2012, Dr. Izrayelit further opined that Pines was "totally disabled," primarily because of his PTSD.  (Id. at 349).

In his decision, the ALJ did not specifically indicate the weight that he accorded to Dr. Izrayelit's medical opinions.  It nevertheless is clear that he gave those opinions at least some weight since he agreed that Pines had PTSD and limitations with respect to interacting with the public and co-workers.  (Id. at 17).  The ALJ concluded, however, that Dr. Izrayelit's "statement that [Pines] is totally disabled" was contradicted by his notes concerning Pines' mental status examination.  (Id.).  The examination to which the ALJ referred was conducted during Dr. Izrayelit's initial session with Pines.  (See id. (citing Exs. 13F at 6, 16F at 7 [R. 333, 356])).[9]  At that time, insofar as relevant, Dr. Izrayelit noted that Pines' behavior and thought process were organized, that he was oriented in time and space, that he was of average intelligence, and that his judgment and impulse control were fair.  (Id. at 333).  Interestingly, Dr. Izrayelit also noted that Pines

---

[9]      Both citations refer to the same page of the record.

denied any hallucinations, a statement that Pines later recanted during subsequent treatment sessions.  (See id. at 356, 362 (referring to auditory hallucinations)).

An ALJ, of course, need not defer to a treating physician's opinion regarding the issue of disability.  See Snell, 177 F.3d at 133.  Here, however, before Dr. Izrayelit opined that Pines was totally disabled, he previously had indicated that, if employed, Pines would be absent from work more than three times each month.  Notably, Dr. Izrayelit reached this conclusion in September 2011, after he had seen Pines at least seven times.  Although the ALJ concluded that Pines was capable of light work, provided that he had only limited interaction with the public and coworkers, he never set forth any reasons – much less good reasons – for failing to accord controlling weight to Dr. Izrayelit's opinion concerning Pines' likely rate of absenteeism.  Certainly, the ALJ's rejection of Dr. Izrayelit's opinion in this regard could not have been based solely on Dr. Fujiwaki's report, which posits that Pines could maintain a "regular" schedule, but does not specifically address whether that schedule would incorporate multiple monthly absences.

This gap is all the more troubling in light of the vocational expert's testimony.  At the hearing, the expert opined, in response to the ALJ's hypothetical, that an individual similar to Pines who had limitations with respect to the use of his left hand and could work only in settings involving limited interaction with the public or coworkers, could find work in the national economy.  (Id. at 49).  When the ALJ asked about such an individual who also had marked limitations maintaining regular attendance,

20

however, the vocational expert opined that the profile posed was "not compatible with competitive work."  (<u>Id.</u> at 48-49).  The vocational expert gave a similar answer when Pines' counsel asked about such a person who was "likely to be absent three times a month or more."  (<u>Id.</u> at 50).  Thus, if Dr. Izrayelit's opinions regarding Pines' ability to report to work regularly had been credited by the ALJ, Pines likely would have been deemed disabled within the meaning of the Act.

The only other reason that the ALJ gave for rejecting Dr. Izrayelit's opinion concerning Pines' ability to work on a set schedule was that it was inconsistent with Pines' "ability to perform his activities of daily living."  (<u>Id.</u> at 17).  During the hearing Pines did testify that on a typical day he might attend a group therapy session at a substance abuse clinic or leave his house if he had "an appointment for public assistance or whatever."  (<u>Id.</u> at 45).  He also reported to Dr. Fujiwaki that he engaged in many daily activities including food shopping and visiting friends.  Nevertheless, Pines did not say anything during his testimony about how often he missed appointments, nor is there any indication that Dr. Fujiwaki raised this issue with him.

In these circumstances, it is apparent that there is no evidence – much less substantial evidence – that Pines could work on a regular schedule without missing three or more days each month.  Indeed, the only evidence in that regard is Dr. Izrayelit's opinion that Pines would miss that much work.  It follows that the case should be remanded so that the ALJ can elicit further information from Drs. Izrayelit and Fujiwaki concerning this narrow, yet potentially dispositive issue.  <u>See</u> <u>Archambault v. Colvin</u>, No.

2:13-cv-292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014) ("It cannot be said that

the ALJ's analysis of these medical opinions was harmless error because the [vocational

expert] essentially testified that if these opinions were adopted, [the claimant] would be

unable to work.").[10]

## VI.    Conclusion

For the foregoing reasons, Pines' motion for judgment on the pleadings,

(ECF No. 10), should be granted in part, the Commissioner's cross-motion, (ECF No.

20), should be denied, and this case should be remanded pursuant to sentence four of

Section 205(g) of the Act for further proceedings consistent with this Report and

Recommendation.[11]

## VII.   Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

---

[10]     In light of this recommendation, I have not addressed the two remaining
assignments of error set forth in Pines' motion papers.  My preliminary review, however,
suggests that neither of these additional claims is meritorious.

[11]     As the Supreme Court has noted, the Act authorizes two types of remands:
remands pursuant to the fourth sentence of Section 405(g) and remands pursuant to the sixth
sentence of that statute.  Melkonyan v. Sullivan, 501 U.S. 89, 97-98 (1991).  Sentence six
remands apply when new evidence has come to light after the administrative hearing that might
change the result.  Id. at 98.  In all other circumstances, the remand is pursuant to sentence four.
Id.  In a sentence four remand the Court enters judgment and does not retain jurisdiction over the
matter.  Id. at 99.

to the chambers of the Honorable Alison J. Nathan and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for extension of time for filing objections must be directed to Judge Pauley.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:        New York, New York
              March 2, 2015

_____
              FRANK MAAS
       United States Magistrate Judge

Copies to all counsel via ECF

23